879 F.2d 1087
 58 USLW 2095
 The UNITED STATES
v.
AMERICAN INVESTORS OF PITTSBURGH, INC., John J. Bruno, John
W. Mendicino, Charles Krzywicki, Alan Zytnick,
Louis J. Pecori.
Appeal of John J. BRUNO.
The UNITED STATES
v.
AMERICAN INVESTORS OF PITTSBURGH, INC., John J. Bruno, John
W. Mendicino, Charles Krzywicki, Alan Zytnick,
Louis J. Pecori.
Appeal of John W. MENDICINO.
The UNITED STATES
v.
AMERICAN INVESTORS OF PITTSBURGH, INC., John J. Bruno, John
W. Mendicino, Charles Krzywicki, Alan Zytnick,
Louis J. Pecori.
Appeal of Alan ZYTNICK.
The UNITED STATES
v.
AMERICAN INVESTORS OF PITTSBURGH, INC., John J. Bruno, John
W. Mendicino, Charles Krzywicki, Alan Zytnick,
Louis J. Pecori.
Appeal of AMERICAN INVESTORS OF PITTSBURGH, INC.
The UNITED STATES
v.
AMERICAN INVESTORS OF PITTSBURGH, INC., John J. Bruno, John
W. Mendicino, Charles Krzywicki, Alan Zytnick,
Louis J. Pecori.
Appeal of Charles KRZYWICKI.
 Nos. 88-3169 to 88-3171, 88-3231 and 88-3232.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 1, 1988.
Decided June 29, 1989.
Rehearing Denied July 24, 1989
in Nos. 88-3171, 88-3231
and 88-3232.
 Rehearing and Rehearing In Banc in Nos. 88-3169 and 88-3170
Denied Aug. 10, 1989.
 
 Richard Wile (Argued), Hess, Reich, Georgiades, Ray and Homyak, P.C., Pittsburgh, Pa., for appellants John J. Bruno and John W. Mendicino.
 Thomas A. Livingston, (Argued), Livingston and Clark, Pittsburgh, Pa., for appellant Alan Zytnick.
 Stanton D. Levenson (Argued), Pittsburgh, Pa., for appellants Charles Krzywicki and American Investors of Pittsburgh, Inc.
 J. Alan Johnson, U.S. Atty., Constance M. Bowden (Argued), Asst. U.S. Atty., Pittsburgh, Pa., for appellee U.S.
 Before HIGGINBOTHAM, MANSMANN and GARTH, Circuit Judges.
 OPINION OF THE COURT
 MANSMANN, Circuit Judge.
 
 
 1
 We today grapple with the extent of criminal liability imposed by the Currency Transactions Reporting Act, 31 U.S.C. Secs. 5313(a); 5322 (as amended 1982), and its attendant regulations, prior to their 1986 amendment. Specifically, we must decide whether customers of a financial institution, participating in both a sophisticated and simplistic money-laundering scheme, can violate the Act.
 
 
 2
 A corporation, American Investors of Pittsburgh, Inc., three of its principals, John J. Bruno, President, John Mendicino, Executive Vice-President, Charles Krzywicki, Secretary-Treasurer, and a corporate customer, Alan Zytnick, seek vacation of convictions resulting from charges that they conspired to and defrauded the United States by obstructing the lawful function of the Internal Revenue Service in collecting information about certain currency transactions involving amounts greater than $10,000. The defendants[1] were charged with various offenses concerning their failure to file Currency Transaction Reports ("CTRs"), required when cash transactions exceed $10,000, and causing another financial institution, Pittsburgh National Bank, to fail to file CTRs, as part of a pattern of illegal activity involving more than $100,000 in a twelve month period, contrary to provisions of the Reporting Act,[2] and the pertinent regulations[3] and in violation of 18 U.S.C. Secs. 2, 371 and 1001.
 
 
 3
 Recently, in United States v. Mastronardo, 849 F.2d 799 (3d Cir.1988), reh'g denied, we held that the Currency Transactions Reporting Act did not give customers of financial institutions fair notice that "structuring" cash transactions to avoid the reporting requirements constituted criminal activity. Not addressed in Mastronardo, but requiring resolution today, is whether structuring of transactions with the intent to avoid the financial institution's duty to file CTRs regarding the transaction in and of itself is forbidden by the Act. In a footnote in Mastronardo, we recognized that, when other courts had been confronted with the subissue of the statutory reporting duty of financial institutions, they considered the specifics of the transactions. We found it unnecessary to analyze the particular financial practices of the Mastronardo defendants because their convictions, solely as customers of a financial institution, clearly violated due process. Id. at 803 n. 9. Because here, however, American Investors was also convicted under 18 U.S.C. Sec. 2(b) of willfully causing a financial institution to fail in its statutory duty, the Mastronardo decision does not have a preclusive effect. We conclude that given the factual specifics, the particular structuring activity involved here was prohibited by the statute, the regulations and the case law interpreting them. Therefore, although Mastronardo would have appeared to compel vacation of the convictions of American Investors relating to its customer-based activity in causing Pittsburgh National Bank to violate the currency reporting laws (Counts 48 through 94), the presence of tandem 18 U.S.C. Sec. 2(b) "willfully causing" convictions, which impute the necessary intent of actors otherwise lacking legal capacity to commit a crime to an innocent intermediary, requires a different result. We find that American Investors here supplied the necessary willfulness element of 31 U.S.C. Sec. 5322 to the entity with the legal capacity to commit the crime, Pittsburgh National Bank, and with one limited exception, we will affirm the judgments of conviction on these counts. Since the arguments championing vacation of the remaining counts had as their premise an overturning of the Pittsburgh National Bank counts, the conspiracy convictions and the substantive convictions relating to American Investors' own failure to file CTRs will likewise stand.
 
 
 4
 We also conclude that the evidence supports the verdicts of guilty on both the conspiracy count and the aiding and abetting the money-laundering scheme count against Alan Zytnick, the customer of American Investors.
 
 
 5
 Finally, we decide that the search of American Investors' office and storage area and the seizure of a large amount of its corporate documents were not unconstitutional and evidence so secured was properly admitted at trial.
 
 I.
 A.
 
 6
 American Investors of Pittsburgh, located in Pittsburgh, Pennsylvania, is a broker and dealer of securities, registered with the Securities and Exchange Commission and a member of the National Association of Securities Dealers, a self-regulatory, non-governmental body which oversees the over-the-counter stock market. Under the Reporting Act's regulations, one of a broker/dealer's legal obligations requires filing a CTR with the Internal Revenue Service when transactions in currency in excess of $10,000 occur. 31 U.S.C. Sec. 5313(a); 31 C.F.R. Sec. 103.22(a). A transaction in currency is defined simply as: "[a] transaction involving the physical transfer of currency from one person to another." 31 C.F.R. Sec. 103.11(o). The form provided for reporting currency transactions, Treasury Form 4789, requests the identity of the individual providing the funds, and, if that individual is not the owner of the funds, the owner of the funds.[4] An additional requirement is that the iinstitution file the report within fifteen days following the day of the transaction. 31 C.F.R. Sec. 103.25(a).
 
 
 7
 American Investors never filed a required CTR in any instance of receipt of cash in excess of $10,000, although, during the time period charged in the indictment, such occasions were well-documented. The allegations of the indictment portrayed a scheme by which American Investors devised various recordkeeping manipulations to disguise the receipt of cash from customers, including, but not limited to, Alan Zytnick. The practice of American Investors' Secretary-Treasurer, Charles Krzywicki, allegedly included utilizing dead or inactive accounts to distort the recording of purchases of municipal bonds and securities by cash customers.[5] Another broker testified that in order to cover up the fact that cash received from certain customers had been placed in an unauthorized account, he would remove the part of the receipt indicating that the transaction had been so processed before sending it to the customer. He would then destroy the monthly statement for the improperly utilized account.
 
 
 8
 Other concealment techniques, ones utilized by President John Bruno and Executive Vice-President John Mendicino, included altering the data both in American Investors' internal records and on the customers' monthly statements to reflect that cash purchases in excess of $10,000 occurring on one day were inaccurately portrayed as having transpired over a number of days and in amounts of less than $10,000.
 
 
 9
 The practice to obscure the receipt of currency involved other aspects of the bookkeeping of American Investors. In recording the receipt of cash from some customers, the word "payment" would sometimes be substituted for the word "cash" on its ledgers. Since there was no corresponding field code for the word "payment" when entries were made on American Investors' computers for these cash transactions, these purchases were listed on the computer as having been accomplished by check. On a number of occasions monthly statements sent to customers who had made cash purchases indicated that the customer had paid by check.
 
 
 10
 The scheme required further refinement since it necessarily entailed the handling of the cash after its receipt from American Investors' customers. American Investors maintained its working and operating accounts at the Seventh Avenue Branch of Pittsburgh National Bank. Sometime after September 1980 the branch manager told Krzywicki that, under new Treasury regulations, the bank, in its capacity as a financial institution, would be obligated to file CTRs whenever American Investors transacted cash business in excess of $10,000. Thereafter, American Investors would pattern its deposits at the bank in order to avoid having single deposits of more than $10,000. For example, although American Investors would deposit all of its checks the day it received them, it maintained safety deposit boxes at the bank in which it would store some of its currency. American Investors would then stagger individual cash deposits in amounts under $10,000, usually via consecutive transactions, into two separate accounts. These are set forth at length at Appendix I.
 
 
 11
 In September of 1982, Henry Brown, the new manager of Pittsburgh National Bank's Seventh Avenue Branch, discovered that CTRs were not being filed by the bank with respect to the American Investors' daily currency transactions in excess of $10,000.[6] As a result, a member of Pittsburgh National's staff informed Brenda Perfetti, an employee of American Investors, that the bank would have to file CTRs when daily multiple cash deposits, when aggregated, totalled in excess of $10,000. On October 20, 1982, Mendicino approached Brown and inquired how they could avoid having the bank file CTRs in regard to American Investors' cash transactions. When Brown told Mendicino that American Investors should be filing CTRs itself, Mendicino replied that the reason American Investors had been making deposits of under $10,000 was to avoid the Treasury's filing requirements. On at least one occasion thereafter, American Investors made multiple currency deposits aggregating over $10,000 into its two accounts at two different Pittsburgh National branches. (Appendix I--No. 14). Prior to September 22, 1982, American Investors had deposited its receipts only at the Seventh Avenue Branch. From November 3, 1982 through May 6, 1983, on twenty-five different days, American Investors continued to make consecutive deposits, each less, but totalling more than $10,000, at the Seventh Avenue Branch. See Appendix I.
 
 
 12
 On May 13, 1983, a warrant was issued authorizing a search of American Investors' offices. Thirty-seven agents from the Internal Revenue Service and the Security and Exchange Commission entered American Investors' office and, over the next ten hours, a search was conducted and employees were interrogated.[7] The warrant authorized the search of twenty-three categories of specifically delineated records and the seizure of other documents and items considered to be fruits, instrumentalities and/or evidence of criminal activity. The breadth of the warrant is an issue raised and discussed later in this decision.
 
 
 13
 Following an investigation, indictments were brought and trial proceeded. The defendants were convicted by the jury and were sentenced on various counts.[8] We have jurisdiction on appeal pursuant to 28 U.S.C. Sec. 1291.
 
 
 14
 Numerous issues have been raised in this appeal, the most compelling of which concerns our recent decision in United States v. Mastronardo, 849 F.2d 799 (3d Cir.1988), interpreting the Currency Transactions Reporting Act 31 U.S.C. Sec. 5311 et seq. Because our plenary review on this legal issue of statutory construction affects other questions raised, we discuss it first.
 
 B.
 
 15
 In Mastronardo, we held that, prior to its 1986 amendment,[9] the Currency Transactions Reporting Act and its regulations did not impose reporting obligations upon customers of financial institutions. In so deciding we noted a split in the circuits on this issue of customer liability and sided with those courts which decided that imposition of criminal punishment on a customer for structuring transactions violated due process since the Currency Transaction Reporting Act did not give customers fair notice that structuring cash transactions violated the Act. Our rationale was that although the act vested substantial authority in the Treasury Department to require the reporting of currency transactions by both financial institutions and other participants, the Secretary had issued regulations mandating that failure to file a CTR subjected only an offending institution to civil and criminal penalties. A customer's decision to pattern individual transactions to keep each under $10,000 was not criminal activity under the provisions of the Act.
 
 
 16
 In Mastronardo, we left open the question of whether the statute outlawed the structuring of transactions by any person, including the financial institution itself, and the extent of an institution's duty to aggregate transactions to determine their reportability.
 
 
 17
 While American Investors urges vacation of all convictions because of our Mastronardo decision, we find the issue to be far more complex. We acknowledge, and the government concedes, that according to Mastronardo, American Investors did not have a legal duty to file CTRs in its capacity as a customer of Pittsburgh National Bank.[10] We must, however, address the government's position that criminal liability may attach to American Investors' actions by virtue of its companion convictions under 18 U.S.C. Sec. 2(b) (1948) (as amended 1951) ("2(b)").
 
 II.
 
 18
 As enacted in 1948, 18 U.S.C. Sec. 2(b) read:
 
 
 19
 (b) whoever causes an act to be done, which if directly performed by him would be an offense against the United States, is also a principal and punishable as such.
 
 
 20
 The House report explaining this 1948 provision instructed that the purpose of Sec. 2(b) was to permit the deletion from criminal provisions of words such as "causes or procures" and to remove any doubt that the legislature intended that one who causes the commission of an indispensable element of an offense against the United States by an innocent agent or instrumentality be guilty as a principal. H.R.Rep. No. 304, 80th Cong., 1st Sess. 2448-49 (1947). This provision was in accord with Supreme Court decisions in Ruthenberg v. United States, 245 U.S. 480, 38 S.Ct. 168, 62 L.Ed. 414 (1918) and United States v. Giles, 300 U.S. 41, 57 S.Ct. 340, 81 L.Ed. 493 (1937).
 
 
 21
 To remove any doubt about the scope of the criminal responsibility of one who, although lacking criminal capacity himself, manipulates another to commit a crime, Congress, in 1951, amended 18 U.S.C. Sec. 2(b) to read:
 
 
 22
 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal. (Emphasis added).
 
 
 23
 In the Senate Report accompanying the proposed amendment it was explained that the section:
 
 
 24
 [i]ntended to clarify and make certain the intent to punish aiders and abettors regardless of the fact that they may be incapable of committing the specific violation which they are charged to have aided and abetted....
 
 
 25
 S.Rep. No. 1020, 82nd Cong., 1st Sess. (1951), reprinted in 1951 U.S.Code Cong. & Admin.Service 2578, 2583 (1951).
 
 
 26
 "Willfully causing" is not an independent crime under Sec. 2(b) because the statute in and of itself does not provide a penalty. Instead, Sec. 2(b) abolishes the common law distinction between principal and accessory. Cf. United States v. Standifer, 610 F.2d 1076 (3d Cir.1979), aff'd, 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980) (discussing aider and abettor liability under 18 U.S.C. Sec. 2(a)).
 
 
 27
 Our court has not had a recent opportunity to discuss Sec. 2(b) liability, but in United States v. Catena, 500 F.2d 1319 (3d Cir.), cert. denied, 419 U.S. 1047, 95 S.Ct. 621, 42 L.Ed.2d 641 (1974), we addressed the issue in connection with a Medicare fraud case. In Catena, a physician was convicted of fraudulently submitting Medicare claims through various insurance carriers. Under the relevant statute, however, only the insurance company could be charged with the substantive offense of submitting fraudulent claims. As to the physician's liability, we held that under the combination of the substantive offense and of Sec. 2(b) the defendant was guilty of causing an innocent intermediary, the insurance company, to present a false claim to the United States.
 
 
 28
 A review of decisions construing Sec. 2(b) liability from other courts of appeals is instructive. In United States v. Ruffin, 613 F.2d 408 (2d Cir.1979), the Court of Appeals for the Second Circuit held when the "causer", although having no legal capacity, provides the necessary mens rea to the innocent intermediary to commit a crime, the causer adopts both the intermediary's act and his capacity. Id. at 415. In United States v. Tobon-Builes, 706 F.2d 1092 (11th Cir.1983) the court likewise explained that Sec. 2(b) is utilized to extend criminal liability to actors lacking legal capacity who cause intermediaries to commit criminal acts where the intermediary, though innocent of the substantive offense, has the capacity to commit that offense. The Court of Appeals for the Eleventh Circuit then cited to United States v. Lester, 363 F.2d 68 (6th Cir.1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 705, 17 L.Ed.2d 542 (1967) for an analysis of principles of criminal law underlying application of Sec. 2(b):
 
 
 29
 It is but to quote the hornbook law to say that in every crime there must exist a union or joint operation of act, or failure to act, and intent. However, this is far from suggesting that the essential element of criminal intent must always reside in the person who does the forbidden act. Indeed, the latter may act without any criminal intent whatever, while the mens rea--"willfulness"--may reside in a person wholly incapable of committing the forbidden act. When such is a case, as at bar, the "joint operation of act and intent" prerequisite to commission of the crime is provided by the person who willfully causes the innocent actor to commit the illegal act. And in such a case, of course, only the person who willfully causes the forbidden act to be done is guilty of the crime.
 
 
 30
 (Emphasis added.) Id. at 73; see also United States v. Heyman, 794 F.2d 788 (2d Cir.), cert. denied, 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986) (Sec. 2(b) holds criminally liable, without regard to guilt or innocence of intermediary, those causing others to commit crimes).
 
 
 31
 The cases which have addressed the issue of "2(b) or not 2(b)" liability in the context of the Currency Reporting Act raise more questions than they answer. In Mastronardo, we did not address the question since there the defendants were acquitted of the Sec. 2(b) charges. We did, however, align ourselves with those courts refusing to impose criminal liability on customers charged with both substantive and Sec. 2(b) violations. What we must first decide today is whether implicit in our holding of Mastronardo, which followed decisions of the First, Seventh, Eighth, and Ninth Circuits, was an adoption of those courts' interpretation of Sec. 2(b) liability. Generally, these courts decided that the imposition of criminal liability upon a customer under Sec. 2(b) requires knowledge of a crime on the part of the actor with the ability to be charged with the offense (here, Pittsburgh National Bank) before such convictions can stand. Because in Mastronardo, the question of criminal liability under Sec. 2(b) was not before us on appeal, our holding need not be construed as an embrace of the First, Seventh, Eighth and Ninth Circuits' analysis of customer liability under Sec. 2(b). We, thus, are free to address the Sec. 2(b) issue, in the context of customer liability under the Reporting Act, on the proverbial clean slate. We must then address the other question not reached in Mastronardo, what is the scope of a financial institution's obligation to report individual cash transactions of less than $10,000 which, when aggregated, exceed that amount?
 
 
 32
 In Mastronardo, we relied upon United States v. Anzalone, 766 F.2d 676 (1st Cir.1985), in which the Court of Appeals for the First Circuit struck down the customer's convictions under the Currency Transactions Reporting Act because the statute gave no fair warning to a bank customer that structuring was disallowed. As to Anzalone's Sec. 2(b) liability, the court found that the bank, under the circumstances of that case, had no knowledge of the structured transactions and thus, did not commit a crime.[11]
 
 
 33
 In reaching our decision in Mastronardo, we also followed United States v. Larson, 796 F.2d 244 (8th Cir.1986). In finding no Sec. 2(b) liability, the court in Larson likewise focused on the fact that the bank was unaware of the structuring activity.[12]
 
 
 34
 In United States v. Varbel, 780 F.2d 758 (9th Cir.1986), the activity involved a customer purchasing with cash six cashier's checks from different banks. Four of the checks were purchased for amounts just slightly less than $10,000 and two were for $6,750 and $6,180, respectively. This court also refused to impose liability under Sec. 2(b), citing no evidence of the banks' knowledge of the structuring.
 
 
 35
 United States v. Gimbel, 830 F.2d 621 (7th Cir.1987), presented a somewhat different situation. Gimbel directed his bank to issue eleven cashier checks, each totalling $9,990. Gimbel was charged, among other crimes, with violating 18 U.S.C. Secs. 2(b) and 1001 which, in combination, bar one from causing another to fail to disclose a material fact to the government. The court in Gimbel found that because the Reporting Act did not make structuring transactions a crime, there was no duty on the part of the bank to report Gimbel's structured transactions. The court believed that, for a fact to be material, the entity must have a duty to disclose it and since, under its view of the Act, the bank did not have to report structuring, there was no violation by virtue of the failure to disclose this fact to the government. In a footnote, however, the court assumed without deciding that Sec. 2(b) may be used to impose criminal liability on an individual who lacks the capacity to commit the underlying offense. Id. at 624, n. 2.
 
 
 36
 In none of these cases did the courts undertake an in depth analysis of Sec. 2(b) liability in reaching their conclusions to overturn the convictions. They, instead, either looked to whether the financial institution had knowledge of the structured transactions, concluded it did not and dismissed the convictions or announced, as in Gimbel, that structuring was not illegal for anybody, therefore, no Sec. 2(b) liability could be imposed. None of the decisions, however, dispute the applicability of Sec. 2(b) to impose criminal liability generally under the Reporting Act, rather Sec. 2(b) liability was rejected because the government did not first establish the existence and subsequent breach of some statutory duty.
 
 
 37
 We believe that those cases followed by us in Mastronardo, focusing concern on the bank's knowledge, did not properly address Sec. 2(b) liability. As we have set forth, what the bank, the innocent intermediary here, knew is immaterial for purposes of proving a Sec. 2(b) violation by a customer.[13]
 
 
 38
 Here, American Investors divided its large currency deposits in order to preclude Pittsburgh National Bank from filing CTRs in regard to them. Whether Pittsburgh National Bank had the duty to report the transactions and, thus, the capacity to commit a crime for failure to do so will be discussed, infra. Assuming, however, that the bank did have such a legal obligation, the extent of the bank's knowledge of the structure is immaterial for Sec. 2(b) purposes. What we focus upon is American Investors', not the bank's intent, and the evidence of American Investors' willfulness in avoiding the reporting requirement is strong. In 1980, when informed by the bank of the necessity to file CTRs for American Investors' over-$10,000 cash deposits, American Investors immediately began structuring its deposits to total under $10,000. This was accomplished by placing large amounts of currency in its safety deposit box at Pittsburgh National Bank and then depositing the cash in staggered amounts into two different accounts. Later, American Investors' utilization of two different branches further shows intent to by-pass Pittsburgh National Bank's requirements to file the CTRs.
 
 
 39
 Mendicino took deliberate steps to ask the bank how to avoid the reporting requirement. Mendicino's knowledge of the filing requirement is evidenced by that inquiry and also by a previous conversation he had with a government agent on an unrelated matter. An agent for the Drug Enforcement Agency testified that, beginning in 1981, he enlisted Mendicino's cooperation to help track down money-launderers who were also suspected drug traffickers. Mendicino expressed his willingness to assist the DEA and, in fact, permitted the agent to review American Investor's customer list. The agent testified that Mendicino was clearly aware of the reporting obligations of financial institutions when cash transactions exceeded $10,000. This testimony was based upon a number of conversations between the agent and Mendicino which focused the financial practices of money-launderers. There was also evidence that, as a financial institution itself,[14] American Investors should have received communications sent from the National Association of Securities Dealers to all of its members regarding their obligations to file CTRs.
 
 
 40
 We conclude that although American Investors could not be guilty, merely as a customer, on the Pittsburgh National Bank counts of a substantive violation of the Currency Transactions Reporting Act, the combination of the bank's legal capacity to commit the crime, if found to exist, with American Investors' willful acts to subvert the bank's obligation, would support the convictions of American Investors on these counts.
 
 III.
 
 41
 The next matter is, of course, whether or not, intent notwithstanding, Pittsburgh National Bank had the legal capacity to commit the crime. Resolution of this issue requires us to return to those waters left uncharted in Mastronardo: does the Act impose a duty on the bank to report any structured cash transactions?
 
 
 42
 We look first, as we must, to the language of the statute and regulations. The statute itself provides little guidance since, by its terms, it merely authorizes the Secretary to prescribe regulations to govern the reporting of currency transactions.[15]
 
 
 43
 We turn then to the governing regulations. As previously set out, the regulations require banks to file a report of each deposit, withdrawal and exchange of currency which involves the physical transfer of currency of more than $10,000.[16]
 
 
 44
 Based upon this language, we must determine whether daily depositing of cash into different accounts and, sometimes, in different branches, in amounts of less than $10,000 but aggregating over this amount, triggers the bank's reporting obligations.
 
 
 45
 An excellent overview of the parameters of the institution's duty under the Reporting Act was recited by Judge Scirica, now of our court, in United States v. Shearson Lehman Brothers, Inc., 650 F.Supp. 490 (E.D.Pa.1986), aff'd in part and rev'd in part, United States v. Mastronardo, 849 F.2d 799 (3d Cir.1988). After deciding that the language of Treasury Form 4789 could not amplify the meaning of a single "transaction," the court nonetheless held that:
 
 
 46
 [T]he statutory scheme imposes a duty on banks to report any transactions exceeding $10,000. Defendants were on notice of the bank's reporting duty which exists without regard to the duty to aggregate that the government sought to impose by means of the Form 4789 instruction.... As a result, defendants cannot act to prevent a bank from fulfilling its duty, therefore causing a bank to commit a crime.... Defendants did not cause the bank to breach its duty when they entered the bank with structured transactions; they caused the bank to violate the law at the earlier point when they broke up their transaction to avoid the $10,000 CTR requirement.
 
 Id. at 497.[17]
 
 47
 Those courts of appeals followed by us in Mastronardo have also had opportunity to re-evaluate the statute and its implications in the context of the reporting duty of financial institutions.
 
 
 48
 For instance, the decision in United States v. Anzalone has been examined by the Court of Appeals for the First Circuit in United States v. Bank of New England, N.A., 821 F.2d 844 (1st Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 328, 98 L.Ed.2d 356 (1987). In this case a bank was found guilty of failure to file CTRs for cash withdrawals of one of its customers. On appeal the bank argued that the Act did not give fair warning that the withdrawals in excess of $10,000 effected by a customer's consecutive use of multiple checks, each less than $10,000, was a violation of the Act. The question addressed was whether "the due process requirement of fair warning forbids a reading of the regulations to impose a duty on the banks to file reports on customers who withdraw greater than $10,000 in cash at one time by using multiple checks." The court categorized the customer's multiple withdrawal activity as a single physical transfer of currency which gave the bank fair warning of its duty to report the transactions.
 
 
 49
 In Pilla v. United States, 861 F.2d 1078 (8th Cir.1988), the Court of Appeals for the Eighth Circuit, citing United States v. Polychron, 841 F.2d 833 (8th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 135, 102 L.Ed.2d 107 (1988) and distinguishing United States v. Larson, held that a customer who was also on the board of directors of a bank had a relationship with a bank such that he would have a duty to report a currency transaction. Unlike Larson, since the bank was aware of the currency reporting violations, Pilla's aiding and abetting the bank's violation sufficed to make his conduct criminal. The court thus found that the bank could have a duty to report certain structured transactions.
 
 
 50
 In United States v. Hayes, 827 F.2d 469 (9th Cir.1987), the Court of Appeals for the Ninth Circuit cautioned that its prior rulings interpreting the language of the Act could not be extended to situations where a banker joined with a customer's attempt to aggregate the transactions to avoid filing CTRs. In Hayes, a bank officer was presented with a brown bag containing $113,500 in cash. The officer split that amount into a number of checks of under $10,000 each and delivered them to the customer. The court found that there was no need to aggregate to consider this activity as a single transaction invoking the reporting requirement.
 
 
 51
 One court already adhering to a broader application of the Reporting Act has, as would be consistent, endorsed liability for financial institutions. In United States v. Lafaurie, 833 F.2d 1468 (11th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 2015, 100 L.Ed.2d 602 (1988), the court held that a bank must file a CTR if multiple currency exchanges of more than $10,000 are made by a single person or his partners or associates in a single day.
 
 
 52
 In interpreting an institution's liability under the Act, the courts focus on the extent of the bank's knowledge and the particulars of the structured transactions. At the very least, if a bank was an active participant in a laundering scheme, it is clear that liability attaches. In our case, there is no allegation that Pittsburgh National Bank or any of its employees was involved in a scheme with American Investors.
 
 
 53
 We turn then to the exact nature of the activity under scrutiny and examine how it comports with the elusive meaning of a reportable currency transaction. This is the reason for our introductory comment that our holding in this case is fact specific. The source of consternation is the absence of a reliable definition of a structured transaction, and, if such a transaction occurs, the extent of the bank's duty to unearth its true nature.
 
 
 54
 To avoid concluding that a bank has a blanket legal duty to aggregate separate occurrences to determine if a reportable transaction has transpired, courts instead choose to label some connected activity as a single transaction clearly contemplated as reportable under the statute and regulations. For example, when different banks are involved, no duty attaches. United States v. Denemark, 779 F.2d 1559 (11th Cir.1986). Also, transactions occurring on different days at the same bank would not invoke the reporting requirement. United States v. Heyman, 794 F.2d at 792. Same day transactions at different branches of the same bank, however, are reportable. United States v. Giancola, 783 F.2d 1549 (11th Cir.), cert. denied, 479 U.S. 1018, 107 S.Ct. 669, 93 L.Ed.2d 721 (1986); accord United States v. Polychron, 841 F.2d at 837.
 
 
 55
 In this case, the transactions occurred on the same day, and on all occasions but one, at the same branch. We conclude that Pittsburgh National Bank had a duty to report this type of transaction. The question of whether, if aware, the bank would have been required to report the scheme of consecutive deposits has been satisfactorily answered by the record. This is evidenced by the bank manager's expression of concern and rush into action when he discovered that the CTRs were not being filed. Also, according to the manager, it was his understanding, gleaned from his training and from Pittsburgh National's internal operating procedures, that transactions such as those engaged in by American Investors were reportable. If Pittsburgh National itself had willfully failed to report these transactions it would have been criminally liable under 31 U.S.C. Secs. 5313, 5322.
 
 
 56
 As to American Investors' integral role, although the structuring of transactions as a customer was not per se illegal, a crime was committed when it took steps to cause Pittsburgh National to fail to fulfill its reporting duty. Specifically, the breakdown of cash deposits prevented the bank from filing the required CTRs. The particular activity of same-day, same-branch depositing of cash in amounts under $10,000, usually via consecutive transactions, which, when aggregated, totalled over $10,000, created a statutory violation.[18] American Investors was cognizant of the bank's reporting duty and acted in a manner to prevent the bank from complying with its statutory obligations. Its willfulness merged with the bank's duty in order to violate the currency reporting statute.
 
 
 57
 With respect to Incident No. 15, which corresponds to Count 72 of the indictment, however, the facts outline an occasion involving two cash transactions under $10,000 occurring on two consecutive days, rather than on the same day. Under our conclusion that same day activity constitutes a reportable action, the defendants' convictions under Count 72 would appear to require reversal.
 
 
 58
 We do not, however, find that an across-the-board reversal of Count 72 is necessary. As to defendants, Bruno, Krzywicki and Mendicino, the sentences imposed under Counts 2-94 were to run concurrent with the sentences imposed under Count 1. Under the concurrent sentence doctrine we have the discretion to avoid resolution of legal issues affecting less than all of the counts in an indictment where at least one count has been upheld and the sentences are concurrent. United States v. Lampley, 573 F.2d 783 (1978). The practicality of this doctrine has been praised, see Jones v. Zimmerman, 805 F.2d 1125 (3d Cir.1986), but has not been invoked in instances where the defendant may possibly suffer collateral consequences, such as impaired parole eligibility. See United States v. Clemons, 843 F.2d 741 (3d Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 97, 102 L.Ed.2d 73 (1988); United States v. Theodoropoulos, 866 F.2d 587 (3d Cir.1989). The record contains no evidence of any such potential detriment as to the individual defendants here, thus, we are free to apply the concurrent sentence doctrine.
 
 
 59
 In contrast, American Investors of Pittsburgh was fined $1,000 for each conviction of Counts 2-94. In this instance the concurrent sentence doctrine will not apply and the conviction under Count 72 must be reversed to reduce American Investors' fine by $1,000. The convictions on all other counts will, therefore, stand.
 
 IV.
 
 60
 The essence of Zytnick's contention that there is insufficient evidence to support the verdict of guilt of both conspiracy and aiding and abetting American Investors' scheme to circumvent the currency reporting laws is that he was merely an innocent customer of American Investors, who, like other innocent customers, was neither aware of nor concerned with American Investors' duty to file CTRs for cash transactions. We review his claim by examining the record in a light most favorable to the government (the verdict winner) and then determine whether there is substantial evidence to support the jury's guilty verdict. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Messerlian, 832 F.2d 778 (3d Cir.1987) cert. denied, --- U.S. ----, 108 S.Ct. 1291, 99 L.Ed.2d 501 (1988). Because of the general nature of the verdict, we do not know if the jury found Zytnick guilty on the basis of aiding and abetting American Investors' scheme to avoid filing CTRs under 18 U.S.C. Sec. 2(a) or under the theory of Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946) (sufficient evidence to sustain conspiracy convictions allows substantive counts convictions to stand, even if conspirator did not commit substantive offenses), which would permit Zytnick's convictions for the substantive counts to stand if there is sufficient evidence to sustain his conviction on the conspiracy count. Either basis withstands scrutiny when the evidence is viewed in a favorable light to the government.
 
 
 61
 In order to prove a conspiracy, the government must show an agreement to commit an unlawful act combined with intent to commit the underlying offense. United States v. Kapp, 781 F.2d 1008 (3d Cir.), cert. denied, 479 U.S. 821, 107 S.Ct. 87, 93 L.Ed.2d 40 (1986). The elements of the conspiracy can be proven entirely through circumstantial evidence. The existence of the conspiracy can be inferred from evidence of related facts and circumstances which demonstrate that the activities of the participants could not have been carried out except as a result of a preconceived scheme or common understanding. Id. at 1010. Although a conspiracy may be proven entirely by circumstantial evidence, the government must nonetheless prove each element beyond a reasonable doubt--that the alleged co-conspirators shared a unified intent to achieve a common goal and an agreement to work toward the goal. United States v. Wexler, 838 F.2d 88 (3d Cir.1988).
 
 
 62
 To support vacation of his conviction, Zytnick contends that proof of his participation in the pinpointed cash transactions was not demonstrated. See Appendix II. He asserts that since the incidents charged in the indictment did not involve any of his named accounts, it is only American Investors which conducted the fraudulent activity and which bears criminal responsibility. Zytnick references the testimony of an American Investors' broker who had indicated that false recordings of transactions could result from reasons solely of the broker's own intent. This testimony, Zytnick asserts, repudiates any inference that cash transactions initiated by him, yet reported in fictitious accounts, evidence a motive on his part to join in American Investors' scheme to fail to file CTRs.
 
 
 63
 Zytnick then argues generally that there was no evidence in regard to the overt acts allegedly supporting the conspiracy conviction, and specifically, that there were not any first-hand witnesses to any of his meetings with Krzywicki.
 
 
 64
 Zytnick also stresses that American Investors never filed a CTR in any instance of a cash transaction over $10,000. The significance of this fact, according to Zytnick, is that if in not filing CTRs for Zytnick's currency transactions American Investors diverted from its ordinary course of business, the break would be evidence of Zytnick's involvement in American Investors' omission. Zytnick asserts, however, that the failure of American Investors to ever file a CTR removes any significance from this finding.
 
 
 65
 A brief recital of testimony regarding Zytnick's transactions with American Investors paints a different picture regarding Zytnick's collaboration in American Investors' failure to file the required reports. The evidence shows that transactions engaged in by Zytnick were credited to a number of accounts--some of which had been opened in his name and in names of family members and some of which had been opened in the names of Dennis Lint, Gene Young, Mary Connolly and Hochstine & Guinan. At trial, Mr. Lint and a representative from Hochstine & Guinan testified that they did not authorize any of the Zytnick transactions to be carried by their accounts nor did they have knowledge of the activity in the accounts regarding the Zytnick transactions. Mary Connolly was deceased in 1981. It goes without saying that any activity in her account after her death was unauthorized. In regard to the Gene Young account, the evidence shows that Zytnick himself opened that account. Investigation failed to unearth Mr. Young; however, the address listed as his residence on American Investors' account was a rental property owned by Zytnick.
 
 
 66
 While currency was used to make purchases to the Lint, Young, Connolly and Hochstine & Guinan accounts, most of the purchases made in the accounts of Zytnick's own name and family names were made by check. Also, the only type of securities purchased through the Lint, Young and Hochstine & Guinan accounts were municipal bonds which are not issued in the names of the purchaser.[19]
 
 
 67
 Although no one testified as to seeing money pass between Zytnick and Krzywicki (Zytnick's broker), the evidence did show that Zytnick was a frequent visitor to the American Investors' offices and, on at least one occasion, came into the office with a bag and entered Krzywicki's office. Krzywicki then approached the cage where the cashier was sitting, handed her a large amount of cash and directed her to purchase municipal bonds through one of the non-Zytnick family accounts. Brenda Perfetti, an employee of American Investors, testified that, through Krzywicki, Zytnick would often make purchases of securities with large amounts of cash. Krzywicki would then instruct her as concerning the appropriate accounts in which to place the orders. She recalled using the Lint, Young, and Hochstine & Guinan accounts.
 
 
 68
 Documentary evidence supports that Zytnick was aware that his cash actually financed securities purchases made through the Lint, Young, Connolly and Hochstine & Guinan accounts. Confirmation slips which evidence buy orders, were introduced into evidence at trial which showed that, although a purchase of a municipal bond was made through one of the non-Zytnick accounts, the confirmation slip had the notation on it to "Deliver to Z." Zytnick's monthly statements did not reflect any transactions into the non-Zytnick accounts. Therefore, it can be inferred that Zytnick was at least aware that Krzywicki was not processing cash transactions through his family accounts.
 
 
 69
 The evidence also shows that coupons from bonds purchased through the Mary Connolly account were later deposited into Zytnick's account and that coupons subsequently cashed in by Zytnick were credited to the Hochstine & Guinan account. Also, on occasion, money was transferred from the Zytnick family accounts into the Hochstine & Guinan account.
 
 
 70
 On May 14, 1987, Zytnick gave a statement to the Internal Revenue Service agents. Zytnick admitted that he managed the accounts in his name and in his family's, but he denied that he transacted business through the Lint and Young accounts. In a subsequent interview, however, Zytnick asked the agents what would happen if bonds did appear in the names of other people. The agent testified at trial that he told Zytnick that it would complicate the matter a great deal. It is significant that after this conversation, coupons from bonds purchased through the Lint, Young, Connolly and Hochstine & Guinan accounts, although mature, were not cashed.
 
 
 71
 This court has had occasion to overturn conspiracy convictions because the defendant was not proven to have had knowledge of the illegal objective contemplated by the conspiracy. None of these cases present a fact scenario where the actions of the defendant were as intertwined as Zytnick's were with American Investors. See United States v. Cooper, 567 F.2d 252 (3d Cir.1977) (in absence of some evidence that defendant knew content of locked compartment or some evidence that defendant engaged in communication of conspiratorial nature, fact finder could not find beyond reasonable doubt that defendant was member of conspiracy (emphasis in original)); United States v. Molt, 615 F.2d 141 (3d Cir.1980) (vague reference in letter regarding previous raid of property not sufficient to show knowledge of illegal importation of goods); United States v. Coleman, 811 F.2d 804 (3d Cir.1987) (prior association combined with rental of room does not amount to specific intent necessary to commit conspiracy). But see United States v. Torres, 862 F.2d 1025 (3d Cir.1988), (defendant's residence and workplace nearby known cocaine trafficking area, arrival at scene shortly after other participants' apprehension and instruction by other participant not to resist arrest: "it won't help any", sufficient circumstances to prove conspiracy).
 
 
 72
 Our review convinces us that a rational trier of fact, see Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), could find that Zytnick participated in this conspiracy to defraud the government. The evidence here shows that cash transactions engaged in by Zytnick were credited to accounts not in his name and not authorized by those named as the account holders. Zytnick's several meetings with Krzywicki, followed immediately by the cash purchases through the unauthorized accounts with the confirmation tickets evidencing the notation "Deliver to Z" support a strong inference that Zytnick shared the purpose of, intended to achieve and agreed to work toward the goal of obstructing the lawful function of the Internal Revenue Service. Zytnick's own statements to the agents involved in the investigation also reflect his involvement in the conspiracy. On one occasion he even indicated to the agents that he was aware of the CTR filing requirement and then questioned the agents as to the effect of dealing in fictitious accounts. The lack of activity in the fictitious accounts following the conversations is strong supportive evidence of knowledge on Zytnick's part.
 
 
 73
 Under United States v. Pinkerton, the evidence to sustain Zytnick's conviction on the conspiracy count set forth supra renders valid the convictions for the substantive counts even though Zytnick himself did not commit the offense.
 
 
 74
 The convictions also withstand scrutiny on the aiding and abetting charge. Clearly, under United States v. Mastronardo, Zytnick could not be charged with the substantive offense of failing to file CTRs since he had no duty to do so.[20] To support a conviction on the charge of aiding and abetting, the government must show that Zytnick in some way associated himself with the criminal venture as something he wished to bring about and that he sought by his actions to make it succeed. United States v. Bey, 736 F.2d 891 (3d Cir.1984), quoting Nye & Nissen v. United States, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949).
 
 
 75
 Zytnick's frequent meetings with Krzywicki, followed immediately by the recording of cash purchases in the non-Zytnick accounts, outline affirmative action on his part to align himself with American Investors' criminal attempts to avoid the reporting requirements. No one disputes that Zytnick could not be charged as a principal; however, the evidence supporting the conspiracy conviction demonstrates with equal force the elements required to support an aiding and abetting conviction. Thus, as either an aider or abettor, or a member of the conspiracy Zytnick's convictions will be upheld.[21]
 
 V.
 
 76
 American Investors also argues that the district court erred in refusing to suppress the records seized as a result of a search of its premises because the warrant was overbroad, suffered from a lack of particularity and because the executing officers flagrantly disregarded the warrant and conducted an impermissible general search. Citing the purported illegality of the search of its office, American Investors also claims that the records seized from American Investors' storage area should be suppressed since the consent obtained for the search was achieved through exploitation of the prior illegal search. Since this claim involves a constitutional issue, it is subject to our plenary review. The subissue of whether the search exceeded the scope of the warrant is factual and is reviewed under the clearly erroneous standard.
 
 
 77
 In support of its application for a warrant to search American Investors' office and to seize certain documents, the government proffered an affidavit from Special Agent Tate of the Internal Revenue Service, the chief investigator of the alleged money-laundering scheme. The affidavit described categories of American Investors' corporate records which were considered to evidence a failure to file currency transaction reports. The United States Magistrate found probable cause to believe that such evidence would be found and issued warrants authorizing searches of American Investors' office and safe deposit boxes. (The warrant was broader in scope than the affidavit in that it extended one of the categories, added others and included a general tail directing the search and seizure of other documents and items which are fruits, and instrumentalities and evidence of the alleged violations.)
 
 
 78
 Armed with the warrant, thirty-seven government officials entered American Investors' offices and conducted a search over a ten hour period. While executing the warrant, the agents were informed by an employee of American Investors that the corporation utilized a separate area to store documents. After obtaining the consent of Mendicino, Bruno and Krzywicki, the agents also searched this area and seized documents stored there.
 
 
 79
 Prior to the return of the indictment, Mendicino, Bruno and Krzywicki filed a joint motion for the return of property under Fed.R.Civ.P. 41(e). After a hearing on the motion, the district court found that the affidavit established probable cause that a crime had been committed. Specifically, the court found that the affidavit recited certain "tips" and explained American Investors' scheme to avoid its currency reporting requirements. The district court, however, found that not all of the categories of documents alleged to constitute evidence of the crimes were authorized to be seized under the warrant. In what it referred to as a "close call", the court found that "there [was] no showing that the scheme to avoid filing of the reports was so pervasive to require an inference that all brokerage records were likely to constitute evidence of the crime under investigation," and, in fact, found that 13 of the categories were not authorized to be seized under the warrant. The court, nonetheless, refused to conclude that the agents acted in bad faith in the warrant's execution. Relying upon United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), which carves out a good faith exception to the fourth amendment exclusionary rule, the district court found that the evidence was obtained by the law enforcement officers acting in reasonable reliance on a search warrant issued by a neutral magistrate. Thus, the ultimate conclusion that the seizure of many of the documents was unsupported by probable cause did not implicate the exclusionary rule since the agents' reliance on the warrant was objectively reasonable.
 
 
 80
 The district court then found a close relationship between the probable cause challenge and American Investors' contention that the warrant did not describe with particularity the evidence to be seized. The court concluded that, despite the large amounts of documents described, the specific categories satisfied the particularity requirement. This conclusion led to the court's corollary decision that the general tail of the warrant did not render the warrant unconstitutionally general. See Andresen v. Maryland, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976).
 
 
 81
 Next, while disparaging the general carelessness of the agents in conducting the search, the district court found that, although portions of the search and seizure appeared to exceed the scope authorized, there was not a flagrant disregard for the warrant which would affect the admissibility of other items seized which fell within the warrant. United States v. Christine, 687 F.2d 749, 757 (3d Cir.1982).
 
 
 82
 In regard to the search of the storage area the district court could discern no causal link between the seizure of documents not authorized by the warrant and the uncoerced disclosure of the storage area and the agents' request for consent to its search. The district court thus held that the seizure of documents from the storage area did not emanate from a disregard of fourth amendment rights.
 
 
 83
 On appeal, American Investors concedes that the affidavit established probable cause that violations of the Currency Reporting Act were committed, but nonetheless contends that the warrant was unconstitutionally infirm either because the affidavit did not show a nexus between the records sought and the alleged criminal violations or because each category was overbroad. American Investors identified the investigating agent's lack of expertise as the cause for the wide ambit of documents seized under the heading of probable cause. For the three categories found by the district court to be properly encompassed by the warrant, American Investors disputes even their inclusion because the warrant was not limited to a specific day, did not identify particular currency transactions, was duplicative of records already obtained by the government from Pittsburgh National Bank, or involved customers of American Investors who were not involved in cash transactions.
 
 
 84
 Our review of a probable cause issue for a search warrant is limited by Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In reviewing a determination as to the existence of probable cause, we must assure ourselves that the magistrate had a substantial basis for concluding that probable cause existed. Id. at 238-39, 103 S.Ct. at 2332-33. As noted, American Investors is not challenging the existence of probable cause itself, rather the range of documents sought as probative of the alleged violations is challenged.
 
 
 85
 Here the magistrate had before her an affidavit from Special Agent Tate detailing his participation in the investigation of the alleged criminal violations of Titles 31 and 18 by American Investors. Tate stated that he received information from a confidential source that American Investors was laundering substantial amounts of currency and then received corroborative information that American Investors had not filed CTRs with the Internal Revenue Service. The affidavit then outlined that a subpoena duces tecum was served on Pittsburgh National Bank for its records concerning American Investors. The affidavit set forth facts demonstrating techniques utilized by American Investors to launder large amounts of currency internally to evade reporting requirements. As a necessary corollary, the affidavit also detailed an analysis of deposits to Pittsburgh National Bank checking accounts, activity regarding American Investors' safe deposit boxes at Pittsburgh National Bank, testimony of an SEC enforcement staff accountant, CTRs which were filed by Pittsburgh National Bank and an examination which showed that no CTRs were filed by American Investors.
 
 
 86
 To support the types of records which should be seized, Tate represented that he consulted with an SEC agent familiar with the variety of documents retained by brokerage firms. The affidavit then outlined 19 categories of documents, later amended to include 23, believed to be evidence of the crimes at issue. The magistrate found the allegations in the affidavit sufficient to support the government's belief that these documents could evidence that American Investors was involved in a scheme to cover up the receipt of currency. Accordingly, the magistrate issued a warrant for their seizure.
 
 
 87
 Despite the limited review of the magistrate's decision in these instances, the district court substituted a de novo interpretation of the affidavit for that of the magistrate's and found that a number of the categories of the warrant were not supported by probable cause.[22] We need not, however, comment on the district court's extended scope of review since it reached the correct conclusion on the suppression issue. The affidavit clearly supported the fact that a broad range of documents would be entailed in sorting out the details of this sophisticated scheme. The fact that the warrant authorized a search for a large amount of documents and records does not necessarily render the search invalid so long as there exists a sufficient nexus between the evidence to be seized and the alleged offenses. Given the complex nature of a money-laundering enterprise, we cannot say that the categories overdescribed the extent of the evidence sought to be seized.
 
 
 88
 Closely intertwined is America Investors' overbreadth challenge. We conclude that Special Agent Tate alleged sufficient expertise and information that the categories listed in the affidavit were proper evidence of the crimes. It is not unreasonable that a large bulk of American Investors' business dealings may have been influenced by the scheme. Therefore, we do not believe that the delineation of the categories was over-broad.
 
 
 89
 We must now ask whether the warrant, viewed in a common sense fashion, was drawn with sufficient particularity so as not to offend the fourth amendment prohibition against general warrants and "general rummagings." Our review of the warrant indicates that it contained a specific description of the records and documents to be seized and did not suffer from a lack of particularity.
 
 
 90
 United States v. Leary, 846 F.2d 592 (10th Cir.1988), cited by American Investors as authority to invalidate the warrant, is distinguishable. In Leary the Court of Appeals for the Tenth Circuit held that even a warrant that describes the items to be seized in broad and generic terms may be valid when the description is as specific as the circumstances in the nature of the activity under investigation can permit. The standard, as announced by Leary, is that warrants for business records should be as sufficiently particular to meet the requirements of the fourth amendment as the information available would allow. In Leary, the warrant was found to be facially overbroad since there was information available to the government to make the description of the items to be seized much more specific. Here, given the range of information required to unravel the laundering scheme and the extent of participation by the parties, the warrant was as specific as circumstances would allow, however broad the requirements of the search might be. We cannot see how any more precise language in the affidavit could have limited the scope of the search authorized by the magistrate, despite the fact that the language of the warrant was broader than that of the affidavit. In this regard, this case is similar to the facts in United States v. Kepner, 843 F.2d 755 (3d Cir.1988). There we held that when the language of the warrant is broader than that of the affidavit and the officers executing the warrant do not have a copy of the affidavit, in a detailed investigation such as the one before us today, the warrant authorizing the search of documents and records is sufficiently particular for purposes of the fourth amendment. Because the items to be seized were described with sufficient particularity, the general tail, which is not read in isolation, does not render the warrant invalid. Andresen v. Maryland, 427 U.S. at 479-82, 96 S.Ct. at 2748-49.
 
 
 91
 Next, in response to American Investors' argument that the good faith exception articulated in United States v. Leon cannot apply here, we reference United States v. Medlin, 798 F.2d 407 (10th Cir.1986) which set out the four situations in which Leon will not apply:
 
 
 92
 (1) the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit (citing Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978));
 
 
 93
 (2) the magistrate abandoned his judicial role and failed to perform his neutral and detached function (citing Lo Ji Sales, Inc. v. New York, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979));
 
 
 94
 (3) the warrant was based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable' (quoting Brown v. Illinois, 422 U.S. 590, 610-11, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975) (Powell, J., concurring)); or
 
 
 95
 (4) the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized (citing Massachusetts v. Sheppard, 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984)).
 
 
 96
 Id. at 409.
 
 
 97
 Since there are no allegations that the magistrate acted inappropriately and because we have discounted the allegations that the affidavit was not supported by probable cause or lacked particularity, we stand by the finding of the district court that, under United States v. Leon, the good faith exception to the exclusionary rule applies.
 
 
 98
 To show a deliberate disregard for the warrant's restrictions, it must be demonstrated that a reasonably well-trained officer would have known that the search was illegal, despite the magistrate's authorization. This is a question of objective reasonableness, rather than subjective good faith. United States v. Leon, 468 U.S. at 919, n. 20, 104 S.Ct. at 3419, n. 20.
 
 
 99
 We once again reference our decision in Kepner. Although in Kepner there was no evidence that the officers acted beyond the scope of the warrant, we do not read Kepner as standing for the proposition that the good faith exception could not apply if evidence outside the scope of the warrant was seized. Rather, the pertinent inquiry is still whether the officers acted reasonably. Phrased another way, given the nature of the search, we ask whether the officers' suspicions have been aroused that certain documents could not be seized under the warrant. Given the necessarily broad scope of the search involved here, we find that the agents reasonably relied on the magistrate's findings that the affidavit justified the seizure of the wide range of documents.
 
 
 100
 The objective standard governing the evaluation of the officers' conduct in executing the warrant is also helpful in deciding whether, as American Investors contends, there was a flagrant disregard of its terms. In United States v. Tamura, 694 F.2d 591, 594 (9th Cir.1982) the court held that when the government's unconstitutional seizure of all corporate records, rather than just those described in the search warrant, was motivated by considerations of practicality and not by a desire to engage in indiscriminate fishing, the documents introduced at trial were not required to be suppressed despite the illegality of the wholesale seizure. We do not go so far as to say that all the documents seized from American Investors' office represented an illegal indiscriminate seizure, but we also do not embrace the government's justifying position that the agents were overwhelmed by the enormity of the task before them. What we focus upon is whether the officers' conduct overreached to the extent that it rendered an otherwise valid warrant so general in nature that it failed to authorize a legal search. Although we agree with the district court that the execution of this warrant was far less than a model of constitutional decorum, we cannot say that it rose to an abusive level. Relying on our conclusion that the agents acted in objective good faith, we hold that the district court did not err in failing to suppress evidence on the basis that there was a flagrant disregard for the terms of the warrant.
 
 
 101
 Since the primary search was not illegal, the consent for the search of the storage area was not tainted and was also proper.
 
 VI.
 
 102
 In addition to the contentions addressed, the defendants, separately and collectively, raised a number of other issues which we have reviewed. We conclude that none merits relief from conviction.[23]
 
 
 103
 The judgments of sentence of all defendants, except for Count 72 against American Investors of Pittsburgh, will be affirmed.
 
 APPENDIX I[1]
 
 104
 1. On or about May 10, 1982, American Investors made three consecutive deposits of currency at PNB, account number 1-256294 for $7,280.35, $8,000 and $8,000.
 
 
 105
 2. On or about May 11, 1982, American Investors made two consecutive currency deposits at PNB, account number 1-256294 for $3,028.44 and $9,000.
 
 
 106
 3. On or about May 17, 1982, American Investors made two consecutive deposits of currency at PNB account number 1-256294 for $2,311.11 and $9,000.
 
 
 107
 4. On or about June 21, 1982, American Investors made two consecutive currency deposits at PNB, account number 1-256307 for $7,000, and account number 1-256294 for $8,000.
 
 
 108
 5. On or about July 16, 1982, American Investors made two consecutive deposits of currency at PNB, account number 1-256294 for $5,000 and $9,971.76.
 
 
 109
 6. On or about July 19, 1982, American Investors made four consecutive currency deposits at PNB, account number 1-256294 for $7,000, $7,000, $5,000 and $2,140.
 
 
 110
 7. On or about July 27, 1982, American Investors made three deposits of currency at PNB, account number 1-256307, transaction 168, $9,000, transaction 170, $6,000, and transaction 171, $8,627.46.
 
 
 111
 8. On or about August 12, 1982, American Investors made three consecutive deposits of currency at PNB, account number 1-256307 for $9,000, $5,000 and $546.20.
 
 
 112
 9. On or about August 20, 1982, American Investors made two consecutive deposits of currency at PNB, account number 1-256307 for $9,000 and $8,853.
 
 
 113
 10. On or about August 24, 1982, American Investors made two deposits of currency at PNB account number 1-256294, transaction 160, $8,250, and transaction 163, $8,215.77.
 
 
 114
 11. On or about September 13, 1982, American Investors made two consecutive deposits of currency at PNB, account number 1-256307, for $9,000 and $1,926.93.
 
 
 115
 12. On or about September 29, 1982, American Investors made two consecutive deposits of currency at PNB, account number 1-256294, for $3,749 and $9,000.
 
 
 116
 13. On or about October 4, 1982, American Investors made two consecutive deposits of currency at PNB, account number 1-256307, for $4,211.55 and $9,000.
 
 
 117
 14. On or about October 22, 1982, American Investors made three deposits of currency at PNB, the branch numbers, account numbers, transaction numbers and amounts as follows:
 
 
 118
 (A) 24 1256307 Transaction No. 694 $8,500
(B) 24 1256307 Transaction No. 695 $8,500
(C) 28 1256307 Transaction No. 268 $3,384.21
 
 
 119
 15. On or about November 3, 1982, American Investors made two consecutive deposits of currency at PNB, account number 1-256294, for $6,000 and account number 1-256307 for $7,000.
 
 
 120
 16. On or about November 29, 1982, American Investors made two consecutive deposits of currency at PNB, account number 1-256307, for $9,000.31, and account number 1-256294, for $1,536.
 
 
 121
 17. On or about December 9, 1982, American Investors made two consecutive deposits of currency at PNB, account number 1-256294, for $9,000.02, and account number 1-256307, for $9,412.
 
 
 122
 18. On or about December 10, 1982, American Investors made two consecutive deposits of currency at PNB, account number 1-256307, for $9,000, and account number 1-256294, for $2,000.
 
 
 123
 19. On or about December 30, 1982, American Investors made two consecutive deposits of currency at PNB, account number 1-256307, for $9,000, and 1-256294, for $6,730.36.
 
 
 124
 20. On or about January 4, 1983, American Investors made two consecutive deposits of currency at PNB, account number 1-256294 for $9,000, and account number 1-256307 for $9,000.
 
 
 125
 21. On or about January 5, 1983, American Investors made two consecutive deposits of currency at PNB, account number 1-256307 for $8,958.91, and account number 1-256294 for $9,000.
 
 
 126
 22. On or about January 6, 1983, American Investors made two consecutive deposits of currency at PNB, account number 1-256294 for $9,000, and account number 1-256307 for $9,281.00.
 
 
 127
 23. On or about January 13, 1983, American Investors made two consecutive deposits of currency at PNB, account number 1-256294 for $9,000, and 1-256307 for $9,000.
 
 
 128
 24. On or about January 19, 1983, American Investors made two consecutive deposits of currency at PNB, account number 1-256294 for $7,003.11, and account number 1-256307 for $9,400.
 
 
 129
 25. On or about February 15 and 16, 1983, American Investors made two deposits of currency at PNB, account number 1-256307 for $9,000 and $9,250.
 
 
 130
 26. On or about February 22, 1983, American Investors made two consecutive deposits of currency at PNB, account number 1-256307 for $7,500, and account number 1-256294 for $3,431.85.
 
 
 131
 27. On or about March 2, 1983, American Investors made two consecutive deposits of currency at PNB, account number 1-256294 for $8,461, and account number 1-256307 for $3,316.02.
 
 
 132
 28. On or about March 8, 1983, American Investors made two deposits of currency at PNB, account number 1-256294 for $9,500, and account number 1-256307 for $9,368.95.
 
 
 133
 29. On or about March 9, 1983, American Investors made three deposits of currency at PNB, the account numbers, transaction numbers and amounts as follows:
 
 
 134
 (A) 1256294 Transaction No. 046 $6,500
(B) 1256307 Transaction No. 280 $9,092.13
(C) 1256307 Transaction No. 281 $2,208
 
 
 135
 30. On or about March 10, 1983, American Investors made two consecutive deposits of currency at PNB, account number 1-256294 for $4,356, and account number 1-256307 for $9,000.
 
 
 136
 31. On or about March 11, 1983, American Investors made two consecutive deposits of currency at PNB, account number 1-256294 for $9,000, and account number 1-256307 for $9,000.
 
 
 137
 32. On or about March 14, 1983, American Investors made two consecutive deposits of currency at PNB, account number 1-256294 for $9,000, and account number 1-256307 for $8,950.00.
 
 
 138
 33. On or about March 15, 1983, American Investors made two deposits of currency at PNB, account number 1-265294, transaction 476, $9,650.49, and account number 1-256307, transaction 478, $9,000.
 
 
 139
 34. On or about March 16, 1983, American Investors made two consecutive deposits of currency at PNB, account number 1-256294, for $9,400, and account number 1-256307 for $9,600.
 
 
 140
 35. On or about March 17, 1983, American Investors made two consecutive deposits of currency at PNB, account number 1-256294, for $9,400, and account number 1-256307 for $9,600.
 
 
 141
 36. On or about March 18, 1983, American Investors made two consecutive deposits of currency at PNB, account number 1-265294, for $8,170, and account number 1-256307 for $9,208.84.
 
 
 142
 37. On or about April 27, 1983, American Investors made two consecutive deposits of currency at PNB, account number 1-256294, for $7,995.67, and account number 1-256307 for $7,100.
 
 
 143
 38. On or about May 2, 1983, American Investors made two consecutive deposits of currency at PNB account number 1-256294, for $5,473.37, and account number 1-256307 for $8,000.
 
 
 144
 39. May 6, 1983, American Investors made two consecutive deposits of currency at PNB, account number 1-256307 for $1,100, and account number 1-256294 for $8,999.10.
 
 APPENDIX II[1]
 
 145
 1. On or about May 25, 1982, American Investors, through Charles Krzywicki, received $16,362 in currency from Alan Zytnick, which was credited to account number 20042, "Hochstine & Guinan."
 
 
 146
 2. On or about August 3, 1982, American Investors, through Charles Krzywicki, received $11,000 in currency from Alan Zytnick, which was credited to account number 20046-1, "Hochstine & Guinan."
 
 
 147
 3. On or about August 10, 1982, American Investors, through Charles Krzywicki, received $10,100 in currency from Alan Zytnick, which was credited to account number 20046-1, "Hochstine & Guinan."
 
 
 148
 4. On or about August 31, 1982, American Investors, through Charles Krzywicki, received $48,000 in currency from Alan Zytnick, which was credited to account number 20046-1, "Hochstine & Guinan."
 
 
 149
 5. On or about September 9, 1982, American Investors, through Charles Krzywicki, received $27,000 in currency from Alan Zytnick, which was credited to account number 20046-1, "Hochstine & Guinan."
 
 
 150
 6. On or about September 10, 1982, American Investors, through Charles Krzywicki, received $51,265.93 in currency from Alan Zytnick, which was credited to account number 20003-1, "Dennis Lint."
 
 
 151
 7. On or about September 10, 1982, American Investors, through Charles Krzywicki, received $19,279.07 in currency from Alan Zytnick, which was credited to account number 20046-1, "Hochstine & Guinan."
 
 
 152
 8. On or about September 16, 1982, American Investors, through Charles Krzywicki, received $68,400.21 in currency from Alan Zytnick, which was credited to account number 20003-1, "Dennis Lint."
 
 
 153
 9. On or about September 21, 1982, American Investors, through Charles Krzywicki, received $63,000 in currency from Alan Zytnick, which was credited to account number 20003-1, "Dennis Lint."
 
 
 154
 10. On or about September 22, 1982, American Investors, through Charles Krzywicki, in two separate transactions, received $18,000 and $24,000 in currency from Alan Zytnick, which was credited to account number 20003-1, "Dennis Lint."
 
 
 155
 11. On or about September 30, 1982, American Investors, through Charles Krzywicki, received $73,870 in currency from Alan Zytnick, which was credited to account number 20003-1, "Dennis Lint."
 
 
 156
 12. On or about October 12, 1982, American Investors, through Charles Krzywicki, received $54,550 in currency from Alan Zytnick, which was credited to account number 20003-1, "Dennis Lint."
 
 
 157
 13. On or about October 13, 1982, American Investors, through Charles Krzywicki, received $43,000 in currency from Alan Zytnick, which was credited to account number 20003, "Dennis Lint."
 
 
 158
 14. On or about October 14, 1982, American Investors, through Charles Krzywicki, received $18,000 in currency from Alan Zytnick, which was credited to account number 20003-1, "Dennis Lint."
 
 
 159
 15. On or about October 15, 1982, American Investors, through Charles Krzywicki, received $62,800 in currency from Alan Zytnick, which was credited to account number 20003-1, "Dennis Lint."
 
 
 160
 16. On or about October 19, 1982, American Investors, through Charles Krzywicki, received $27,000 in currency from Alan Zytnick, which was credited to account number 20003-1, "Dennis Lint."
 
 
 161
 17. On or about October 20, 1982, American Investors, through Charles Krzywicki, received $15,500 in currency from Alan Zytnick, which was credited to account number 20003-1, "Dennis Lint."
 
 
 162
 18. On or about October 26, 1982, American Investors, through Charles Krzywicki, received $34,160 in currency from Alan Zytnick, which was credited to account number 20003-1, "Dennis Lint."
 
 
 163
 19. On or about October 27, 1982, American Investors, through Charles Krzywicki, received $32,500 in currency from Alan Zytnick, which was credited to account number 20003-1, "Dennis Lint."
 
 
 164
 20. On or about October 28, 1982, American Investors, through Charles Krzywicki, received $28,500 in currency from Alan Zytnick, which was credited to account number 20003-1, "Dennis Lint."
 
 
 165
 21. On or about October 29, 1982, American Investors, through Charles Krzywicki, received $30,583.43 in currency from Alan Zytnick, which was credited to account number 20003-1, "Dennis Lint."
 
 
 166
 22. On or about November 1, 1982, American Investors, through Charles Krzywicki, received $13,700 in currency from Alan Zytnick, which was credited to account number 20003-1, "Dennis Lint."
 
 
 167
 23. On or about December 15, 1982, American Investors, through Charles Krzywicki, received $18,000 in currency from Alan Zytnick, which was credited to account number 20032-1, "Mary Connolly."
 
 
 168
 24. On or about December 16, 1982, American Investors, through Charles Krzywicki, received $32,988.31 in currency from Alan Zytnick, which was credited to account number 20032-1, "Mary E. Connolly," and account number 20171-1, "Gene Young."
 
 
 169
 25. On or about December 17, 1982, American Investors, through Charles Krzywicki, received $10,646.21 in currency from Alan Zytnick, which was credited to account number 20032-1, "Mary E. Connolly."
 
 
 170
 26. On or about April 15, 1983, American Investors, through Charles Krzywicki, received $11,840.59 in currency from Alan Zytnick, which was credited to account number 20171-1, "Gene Young."
 
 
 
 [1]
 Unless otherwise noted, the defendants, Bruno, Mendicino, Krzywicki and American Investors of Pittsburgh, will be referred to collectively as "American Investors."
 
 
 [2]
 The relevant provisions of Title 31 are as follows:
 Sec. 5313. Reports on domestic coins and currency transactions
 (a) When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes. A participant acting for another person shall make the report as the agent or bailee of the person and identify the person for whom the transaction is being made.
 Sec. 5322. Criminal penalties
 (b) A person willfully violating this subchapter or a regulation prescribed under this subchapter (except section 5315 of this title or a regulation prescribed under section 5315), while violating another law of the United States or as part of a pattern of illegal activity involving transactions of more than $100,000 in a 12-month period, shall be fined not more than $500,000, imprisoned for not more than 5 years, or both.
 
 
 [3]
 The regulation in effect at the time of the charged violations requiring the filing of reports for currency transactions read:
 Sec. 103.22 Reports of currency transactions.
 (a)(1) Each financial institution shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution, which involves a transaction in currency of more than $10,000....
 
 
 [31]
 C.F.R. Sec. 103.22(a)(1) (1982)
 
 
 [4]
 A number of cases have discussed the legal effect of the language of Form 4789. The cause for controversy is that the form provides an interpretation of activity deemed to constitute a single transaction for reporting purposes, a delineation otherwise lacking in the statute and regulations. Form 4789 states that: "[m]ultiple transactions by or for any person which in any one day total more than $10,000 should be treated as a single transaction, if the financial institution is aware of them." U.S. Dept. of Treasury Form 4789 (1982). Since utilization of this definition could be construed to impose new duties on financial institutions, courts have refused to treat the form as an agency rulemaking establishing a basis for liability because the form was not promulgated in accordance with the safeguards provided by the Administrative Procedure Act, 5 U.S.C. Secs. 553(b); 551(4). See United States v. Reinis, 794 F.2d 506 (9th Cir.1986); United States v. Shearson Lehman Bros, Inc., 650 F.Supp. 490 (E.D.Pa.1986)
 
 
 [5]
 For a specific delineation of the Krzywicki-Zytnick transactions, see Appendix II. Both Appendix I, which sets forth in detail American Investors' banking activity at Pittsburgh National Bank and Appendix II were compiled from the indictments which were issued in this case. Our review of the record verifies that the allegations of the indictment utilized in the appendices were satisfactorily proven at trial
 
 
 [6]
 On September 16, 1982, Brown was informed by the lead teller of the Seventh Avenue Branch that American Investors was depositing currency of up to $50,000 a day. Discovering that Pittsburgh National was not filing CTRs in regard to these transactions, Brown himself began to prepare CTRs for American Investors' currency deposits. At the same time, Brown decided to seek advice concerning this situation from bank authorities and from a neighbor who worked for the FBI. Brown was then contacted by Special Agent Robert Tate of the Internal Revenue Service who told Brown not to file the CTRs. In a subsequent conversation, this advice was reversed and Brown began filing CTRs, as required, in regard to American Investors' cash deposits
 
 
 [7]
 See United States v. American Investors of Pittsburgh, Inc., 672 F.Supp. 850 (W.D.Pa.1987)
 
 
 [8]
 Specifically, the defendants were convicted as follows: all defendants were found guilty of conspiring to defraud the United States by failing to file CTRs in a pattern of illegal activity involving transactions of more than $100,000 in a twelve month period contrary to 31 U.S.C. Secs. 5313, 5322(b), and in violation of 18 U.S.C. Sec. 371 (Count 1). American Investors of Pittsburgh, Bruno, Mendicino and Krzywicki were convicted of failing to file and causing American Investors of Pittsburgh to fail to file CTRs with the Internal Revenue Service (Counts 2 through 47) and of unlawfully causing Pittsburgh National Bank to fail to file CTRs with the Internal Revenue Service (Counts 48 through 94). The Pittsburgh National Bank counts were considered as part of the pattern of illegal activity involving transactions exceeding $100,000 within a twelve month period (May 10, 1982 through May 6, 1983) in violation of 31 U.S.C. Secs. 5313 and 5322(b) and 18 U.S.C. Sec. 2. Zytnick, the customer, was convicted as an aider and abettor on Counts 23 through 47 concerning American Investors' failure to file CTRs with the Internal Revenue Service in connection with receipt of currency from him committed as part of a pattern of illegal activity involving transactions exceeding $100,000 within a twelve month period, (May 25, 1982 through April 25, 1983), in violation of 31 U.S.C. Secs. 5313, 5322(b) and in violation of 18 U.S.C. Sec. 2. Zytnick was acquitted of Counts 87 through 94, which charged him with in connection with causing Pittsburgh National to fail to file CTRs
 At the close of the government's case, the district court granted the defendants' motion for judgment of acquittal on Counts 95 through 156, which charged them with concealing material facts regarding the receipt of currency from the Securities and Exchange Commission in violation of 18 U.S.C. Secs. 1001 and 1002.
 
 
 [9]
 Congress, as a portion of the Anti-Drug Abuse Act of 1986, Pub.L. No. 99-570, 100 Stat. 3207-22 (amended at 31 U.S.C. Sec. 5324 (Supplement 1989)), clarified the status of structuring so that, now, no person may cause or attempt to cause a financial institution to fail to file a currency transaction report
 31 U.S.C. Sec. 5324 reads:
 Sec. 5324. Structuring transactions to evade reporting requirement prohibited
 No person shall for the purpose of evading the reporting requirements of section 5313(a) with respect to such transaction--
 (1) cause or attempt to cause a domestic financial institution to fail to file a report required under section 5313(a);
 (2) cause or attempt to cause a domestic financial institution to file a report required under section 5313(a) that contains a material omission or misstatement of fact; or
 (3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.
 
 
 [10]
 We recognize that American Investors had a legal duty to file CTRs as a financial institution when it received cash from its customers--a matter not discussed here
 
 
 [11]
 In the concurring opinion, Judge Aldrich referred to that particular day in which the defendant purchased three checks at one bank, albeit different branches, and found that, in such an instance, the bank had a duty to report the structured transaction. Anzalone, 766 F.2d at 684 (Aldrich J. concurring). Since the government did not distinguish this date from the other facts (Anzalone utilizing different banks on different dates) Judge Aldrich found it unnecessary to address whether the same day transactions were reportable
 
 
 [12]
 The Court of Appeals for the Eighth Circuit had a recent opportunity to explain its holding in Larson. In U.S. v. Polychron, 841 F.2d 833 (8th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 135, 102 L.Ed.2d 107 (1988), a president of a bank was charged under Sec. 2(b) with causing the bank to fail to file CTRs. In imposing liability in Polychron, the court distinguished Larson because:
 It [was] axiomatic that in [Polychron ] the bank was alleged to be aware of the statutory duty to report as well as the deliberate efforts to evade that duty.... Polychron's alleged complicity in structuring the withdrawal of currency ... in an effort to avoid the reporting requirement is enough to differentiate this case from Larson and others dealing with the criminal liability of bank customers who structure currency transactions.... Polychron willfully caused [the bank] to fail to file the CTRs.
 Id. at 836.
 
 
 [13]
 This retrospective examination in no way repudiates our decision in Mastronardo, since, there, the defendants were acquitted of the Sec. 2(b) charges. We hold fast to our holding in Mastronardo that convictions of customers under the substantive provisions of the Currency Reporting Act, prior to its amendment, violated due process
 
 
 [14]
 31 U.S.C. Sec. 5312(a)(2)(G) defines financial institution to include a broker or dealer registered with the Securities and Exchange Commission under the Securities Exchange Act of 1934. 15 U.S.C. Sec. 78a et seq
 In this regard, Judge Garth would question whether the rationale of Mastronardo has any application here. Since American Investors was a financial institution as defined by the Act and chargeable with knowledge of the filing requirements, Judge Garth argues that any legal leeway which American Investors might be afforded as a customer is abridged.
 
 
 [15]
 See supra note 2
 
 
 [16]
 See supra note 3
 
 
 [17]
 It is important to note that Judge Scirica's opinion was written in response to the motion to dismiss the indictment issued against the Mastronardo defendants, when the Sec. 2(b) charges were still viable. Because the defendants were later acquitted of the Sec. 2(b) charges, we did not address that statute's applicability on appeal
 
 
 [18]
 We note that Incident No. 14 in Appendix I refers to an occasion when American Investors utilized two different branches. A single deposit at one of the branches was under $10,000. Although this might appear to take this particular transaction out of our description of reportable activity, because the multiple deposit at the other branch occurring on the same day did fall within our description, i.e., two under $10,000 individual transactions, which, when aggregated, totalled over $10,000, the different branch activity of one transaction under $10,000 is not fatal to that count of the indictment
 
 
 [19]
 Only four purchases of municipal bonds were made in accounts listed in the name of Zytnick and members of his family, a fraction of the transactions occurring in these accounts
 
 
 [20]
 The government contends that discussion and resolution of the Mastronardo issue should not affect the convictions of Zytnick because although he joined in the issues raised by the other defendants he did not specifically address the issue in his brief nor is the issue similar to the ones raised by the other defendant. We conclude that Zytnick's joinder of issues request, coupled with his argument that if he had been aware of the CTR requirement he could have structured his transactions to avoid any violation, is sufficient to put the issue of the impact of the holding of Mastronardo before us. We nonetheless note that the relief afforded to customers under Mastronardo does not apply to Zytnick, since he was not charged as willfully causing a violation of the Currency Transactions Reporting Act, but as an aider and abettor thereof
 
 
 [21]
 We note that Zytnick's Count 1 conspiracy count could have been based on either causing American Investors to fail to file CTRs or causing Pittsburgh National Bank to fail to file CTRs. Nevertheless, we believe this conviction must be sustained. Given Zytnick's acquittal on the substantive Pittsburgh National counts and his conviction by the jury on the substantive American Investors count, we believe that the jury must have based Zytnick's Count 1 conspiracy conviction on the American Investors prong of the conspiracy. See, e.g., United States v. Asher, 854 F.2d 1483 (3d Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 836, 102 L.Ed.2d 969 (1989)
 
 
 [22]
 The government has argued in its brief, without cross-appealing, that the district court did in fact err in this finding
 
 
 [23]
 Such claims include allegations of error in the district court's failure to suppress evidence obtained as a result of service of a grand jury subpoena made on Pittsburgh National Bank; the district court's denial of defendant Zytnick's motion for a bill of particulars; the district court's denial of Zytnick's motion to dismiss the indictment on due process grounds alleging selective prosecution; admission into evidence of a notice sent by the NASD to its members regarding CTR filing requirements; the district court's denial of Zytnick's request for severance; the district court's instruction to the jury that in determining American Investors' knowledge it could impute the knowledge of any employee; alleged abuse of discretion in the district court's denial of Zytnick's alleged "theory of defense" instruction; the district court's error in charging the jury with respect to the Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), theory of vicarious liability
 
 
 [1]
 Source: Indictment, United States of America v. American Investors of Pittsburgh, et al., No. 87-96, (W.D.Pa.1987), Record at 18A
 
 
 [1]
 Source: Indictment, United States of America v. American Investors of Pittsburgh, et al., No. 87-96 (W.D.Pa.1987), Record at 18A